## AFFIDAVIT SPECIAL AGENT TUCKER J. HEAP

I, Special Agent Tucker J. Heap, being duly sworn, depose and state as follows:

1. I am a special agent with the Federal Bureau of Investigation ("FBI"). I have been employed by the FBI since June 2006 and am assigned to the Boston Division. I am assigned to the Boston Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force, which consists of federal law enforcement to include the Drug Enforcement Administration ("DEA"), Homeland Security Investigations ("HSI"), the United States Marshals Service ("USMS"), the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and other state and local law enforcement agencies.

2. I personally have participated in almost all aspects of drug investigations. I have utilized various investigatory tools and techniques, including confidential informants, cooperating witnesses, physical surveillance, and witness interviews. I am familiar with the benefits and limitations of these techniques. I am familiar with the methods of operation, including distribution, storage, and transportation of drugs and the collection of currency that constitutes the proceeds of drug activities, used by those engaged in illegal activities involving controlled substances. I have participated in investigations, in conjunction with other federal law enforcement agencies, of large-scale national and international drug trafficking organizations. These investigations have included the introduction of undercover officers and confidential informants into these groups and the implementation and management of electronic surveillance, including but not limited to State and Federal Title III Intercepts and Global Positioning Systems ("GPS"). I am a fluent Spanish speaker.

3. My training and experience has familiarized me with the manner in which

Drug Trafficking Organizations ("DTO") store, distribute, transport and sell illegal narcotics then collect and conceal the proceeds. I am familiar with the manner in which DTOs use vehicles, common carriers, mail and private delivery services and a variety of other methods to transport and distribute illegal narcotics, as well as the methods used to launder the proceeds of DTOs. I am familiar with the manner in which DTOs use codes or coded language via cellular telephone, pager or e-mail or others means to facilitate their activities. I am also familiar with the manner in which DTOs use vernacular or street names for drugs or proceeds in an attempt to disguise the subject of their conversations or operations. Moreover, I have received specialized training in the field of narcotics identification, investigation and enforcement.

4.     I am submitting this affidavit in support of an application for a criminal complaint charging Marshall H. Dion with possession with intent to distribute marijuana, in violation of 21 U.S.C. §841(a)(1).

5.     As a result of my personal participation in this investigation, through my conversations with other law enforcement officers, upon information that I have received from a variety of other sources, including public records, and my analysis of reports prepared by other officers, I am familiar with all aspects of this investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter.

2

## **PROBABLE CAUSE**

6.     On June 18, 2013, Marshall Dion, was stopped for speeding by the Junction City Police Department ("JCPD") in Kansas, while driving a 2002 GMC Sierra pickup with Colorado registration plates.  During the JCPD roadside interview, Dion presented the interviewing officer with a valid Arizona driver's license, and explained that he was traveling from Pennsylvania en route to his home in Tucson, Arizona.  Dion stated that he had residences in Massachusetts and Arizona.

7.     Dion further explained that he had traveled from Tucson, Arizona, to Yardley, Pennsylvania to meet with his certified public accountant ("CPA").  He stated that he had stayed in Pennsylvania for three days and was headed home to Tucson, Arizona.  Dion claimed that he traveled to Pennsylvania to meet with his CPA because she gives him "a break" on the charges.

8.     The interviewing officer detected signs of deception throughout the interview, including a travel itinerary that did not seem to make sense.  Dion continued to talk to the officer after he had been issued a written citation for speeding and consented to a search of his truck.

9.     Upon opening the rear gate of the truck, the officer observed several items that appeared to be random junk items and a refrigerator.  When the officer asked Dion where these items had come from, Dion told the officer that he picked them up in Boston. This was the first time that Dion had mentioned being in Boston.

10.     The interviewing officer, who was also a K9 officer, conducted an exterior sniff of Dion's vehicle with his K9.  The K9 alerted to the area of the front driver side wheel well and in the area of the front bed on the passenger side.  The officer asked Dion

3

if he had any cocaine, heroin, ecstasy, or marijuana in the truck, and Dion answered, "No." When the officer asked Dion if he had any large amounts of United States currency with him, Dion first answered that he did not, and then said that he had approximately $6,000 worth of cash with him to be deposited into the bank.

11.    The officer then continued the search of the vehicle and located two FedEx boxes in front of the refrigerator. These boxes contained a large amount of United States currency. A second officer, who was assisting the search, located two additional boxes beside the refrigerator, which also contained a large amount of United States currency. Three of these boxes had permanent marker writing on them that read "24 100s." The fourth box was marked "9 100s." A subsequent search revealed that these boxes contained $100 bills wrapped in stacks totaling $10,000 each, with bands that indicated the total. Several other bundles of cash were also located within the truck. A total of $828,220 was recovered from Dion's truck, $810,900 of which was in the FedEx boxes.

12.    In addition to the cash, JCPD located in Dion's truck detailed travel logs that listed the trips and the routes that Dion took between Arizona and Boston, Massachusetts, as well as a printed contact list. The contact list included many phone numbers and home addresses, including numbers and addresses for ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮.

13.    Dion was arrested and read his *Miranda* rights. Dion initially claimed that he had done nothing wrong and that he was "just driving down the road." When Dion was told that he was driving with a large amount of cash, he responded, "I didn't even know that." Dion further stated, "I don't even know who loaded my truck." When the

4

interviewing officer described a situation to Dion where drugs were found by the police and then subsequently delivered in the hopes that Dion would agree to conduct a controlled delivery of the money, Dion quickly stated that he does not "bother with dope anymore." Dion then went on to describe himself as a "mule," which I understand to be a person who simply drives contraband, including drugs and money, for an organization. Dion explained to the interviewing officer that he takes the money and "drops it when he gets to his destination," and that he does not know "where it goes or anything else." Dion was asked if the money was his and he responded, "I can't even tell you that." Dion admitted that the money "would probably go across the border." When he was asked if he would take it across the border Dion replied, "You're damn right I wouldn't. I don't go across the border." Dion was speaking of the United States-Mexico border.

14.     Dion further explained that when he was in Boston, someone would load his truck "probably in the Boston area." Dion claimed that he just parked the truck in a parking garage in Boston and rented a vehicle to drive while the unidentified individuals allegedly loaded the truck with cash.

15.     Dion stated that he has no pension, and his only source of legal income is social security, which pays him less than $690 per month. However, during the search of Dion's truck, the JCPD located checks that were made out to a trust account and appeared to be executed for deposit. A financial investigation revealed that this trust account, which contained approximately $1.9 million, is in Dion's name. The JCPD seized this account and the funds on deposit for forfeiture.

16.     As a result of this traffic stop, Dion was arrested on state charges in Kansas. He has been in state custody since then and remains in state custody as of the

5

date of this Affidavit.

17.    The JCPD seized various other items from Dion's truck, including a Garmin GPS unit. The JCPD searched the Garmin GPS and found that Dion had arrived in Boston at ▮▮▮▮▮▮▮▮▮, Boston, Massachusetts, on June 2, 2013, at approximately 10:08 p.m.  The GPS showed that the following day, June 3, 2013, at approximately 6:29 a.m., Dion traveled to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮, Massachusetts, and remained there for approximately 30 minutes. The GPS showed that Dion went to the ▮▮▮▮▮▮▮▮▮▮▮ a second time on June 6, 2013, and remained there for approximately 90 minutes.

18.    Dion has made many calls since he was taken into custody.  These calls have been recorded pursuant to standard operating procedure at the jail where Dion is being held.  Dion is aware that these calls are recorded.

19.    On June 28, 2013, Dion placed several calls from jail to ▮▮▮▮▮ at ▮▮▮▮▮▮, which is the number listed on the contact list found in Dion's truck at the time of his arrest as ▮▮▮ home phone number.  (A query of a public database also lists this number as being ▮▮▮ home number.)  All of these calls were recorded. During several of the calls, Dion reached ▮▮▮ answering service and left a message telling ▮▮▮ that he (Dion) needed ▮▮▮ to contact ▮▮ or ▮▮ because "they needed some help" from ▮▮▮.  Based on the investigation to date and for reasons set out in this Affidavit, I believe Dion was referring to ▮▮▮▮▮▮▮ and ▮▮ r when he referred to "▮▮▮▮▮."

20.    Later that day, Dion made another recorded jail call and spoke with ▮▮▮▮.  ▮▮▮ told Dion that he was "trying to call ▮▮▮," but he had spoken to

"▮▮▮" instead. Dion told ▮▮▮ that ▮▮▮ "don't know anything." Dion then told ▮▮▮ to call ▮▮▮ again "on Monday" (July 1, 2013) because "they may need some money for attorneys for me, because they've locked up everything that I have, ok?" ▮▮▮ responded, "Yep." Dion went on to tell ▮▮▮, "I got stopped, and I was carrying money, and that's what I'm charged with." ▮▮▮ responded, "Ok." Dion then stated, "No drugs, so uh, we should be ok, I don't know. But give ▮▮▮ a call Monday, see if he needs any help from you.' ▮▮▮ responded, "Yeah, that's the first thing I asked ▮▮▮. ▮▮▮ um, what do you want me to do?' 'Um, nothing.' I said, um, 'Do you want me to go someplace?' 'No.'" Dion cut ▮▮▮ off by saying, "Nope, nope, nope, nope. Ok. This is not, this is not, wait a minute, this is not a secure phone so I can't talk with you." ▮▮▮ replied, "Ok" and asked for further directions about with whom he should talk on Monday. Dion told ▮▮▮ to call ▮▮▮ on Monday and "ask him what the procedure is," and ▮▮▮ responded that he would.

21.    Also on June 28, 2013, Dion placed a recorded jail call to ▮▮▮ and spoke with an individual whom he addressed as "▮▮▮," who I believe was ▮▮▮ for reasons set forth in this Affidavit. Dion asked "▮▮▮," "Did ▮▮▮ talk to you?" I believe that Dion was referring to ▮▮▮, who is Dion's ▮▮▮. ▮▮▮ responded, "Yes." Dion said, "Ok, can you, can you get that thing to ▮▮▮ for me?" After a short pause ▮▮▮ responded, "I'll take care of everything." Dion responded, "Ok, I appreciate it, thank you very much." Dion said that ▮▮▮ would "fill you in" and promised to talk to ▮▮▮ later. ▮▮▮ asked Dion if he was "ok," and Dion responded by saying, "Yep, yep, oh no, I'm ok, but, but, I'm uh, you know, I'm in the, you know right now I'm in the . . . locked up, and that thing that,

that thing that uh, er, uh, that box that you have of mine . . . I want you to give that to ███████. Ok?" ████████ responded, "I understand, I understand, I understand." I believe that Dion was using coded language to direct ████████ to bring an item of contraband, possibly incriminating evidence, to ████████ in order to prevent law enforcement from obtaining that item and using it in their case against him.

22. After listening to this call, which was supplied to the FBI by the JCPD, the FBI reviewed a copy of Dion's cell phone contact list that was found in Dion's truck at the time of his arrest. That list contained an entry for telephone number ████████ under the name ████████████████████ ████████ Massachusetts. A public database check revealed that ████████ ████████████████████ ████████████ Massachusetts.

23. On Monday, July 1, 2013, the FBI interviewed ████████ on the front steps of his residence in ████████ Massachusetts. ████████ acknowledged that ████ ████████ had told him that Dion "got in trouble" in Kansas, but he could not recall the name of ████████ told him ████████ was asked when he had last spoken with Dion, ████████ responded, "A long time ago." When ████████ was confronted with the fact that he had talked to Dion in a recorded jail call only three days earlier, ████████ admitted that he had spoken with Dion.

24. ████████ was asked if he had any property belonging to Dion and ████████ stated that he did not. ████████ was asked about the "box" that Dion referred to in the recorded jail call. ████████ stated that he did not know what Dion was talking about during the call. ████████ was reminded that he had responded, "I'll take care of

8

everything" and "I understand, I understand, I understand."   Nevertheless, ███████

maintained that he had no idea what Dion was talking about during the call. ███████

was asked if he had given any property or money to any attorney, and he stated that he

had not.

25.    ███████    was asked if anyone had contacted him about Dion's arrest.

███████  told investigators that an attorney had called him to ask if he could help Dion,

but ████  said that he had no way to help. ███████  said he could not recall the name

of the ██████  who had called.  When was asked when he had last spoken to ███████

(████████████████████████████████████████) ███████

stated that he had spoken with ██████  when he called to talk with███████  (This

contradicted ███████  previous statement that that ██████  had actually called him.)

██████  was then able to recall that ██████  was the ████  who had called him about

Dion. ██████  was then asked if he had taken any money or property to any ████  for

Dion and he stated that he had not.

26.    On Tuesday, July 2, 2013, the FBI served a subpoena on ███████

████████████  for, among other things, a list of all current renters of storage units

at the facility.  A review of the list provided by ████████████  revealed

that both Dion and ██████  rented storage units at ████████████  (units

████████  respectively).   According to ████████████

Dion has rented a unit there since ████ , and ██████  had rented a unit there since ████ .

27.    Investigators summoned a Massachusetts State Police K9 unit to ██████

████████████  in order to conduct an exterior sniff of the area around the two

units rented by Dion and ██████ .  The K9 is trained and certified in narcotics detection

9

and his handler confirmed that he is reliable. The K9 gave a positive alert to Dion's unit

███, indicating that a narcotic odor was present. Based on this positive alert, a state

search warrant was obtained and executed at Dion's storage unit. Execution of this

search warrant resulted in the seizure of $11,519,900 in United States Currency,

approximately 168 pounds of high-grade marijuana, and ledgers and records apparently

related to Dion's drug distribution operation.

    28.    Among the records discovered was a checkbook ledger with entries dated

from 1996-1998, including several entries detailing yearly rental payments to ███

████████████████████████████████ Massachusetts.  I

contacted the owner of ██████████████, and he confirmed that Marshal Dion was

a longtime customer and currently had ████████████████. A state search

warrant for Dion's storage unit at ███████████ was obtained, the execution of

which resulted in the seizure of an additional $136,822 in United States Currency and an

additional 227 pounds of high-grade marijuana.

    29.    Based on the information developed during the execution of these search

warrants, the DEA in Tucson, Arizona, sought and obtained federal search warrants for

two residences and three storage units belonging to Dion in Tucson, Arizona. As a result

of the execution of those search warrants, the DEA seized $888,432 in United States

currency.

    30.    Records obtained from Dion's storage unit ███ █ ███████ reveal

that Dion has been trafficking in large amounts of marijuana since at least 1992. These

records include detailed records of customers, amounts of marijuana, and cash balances,

as well as airline, bank, and rental car records, and pieces of mail addressed to Dion. The

10

amount of marijuana and drug proceeds accounted for in these records is substantial.

31.     Based on my training and experience, the amount of marijuana found in Dion's storage units, the manner in which the marijuana was packaged, the nature of the packaging materials, and the presence of detailed ledgers and massive amounts of U.S. Currency are all indicia of drug trafficking and distribution. Therefore, I am submitting this Affidavit in support of a criminal complaint charging Dion with possession with intent to distribute marijuana, in violation of 21 U.S.C. §841(a)(1).

11

## CONCLUSION

Based on all of the foregoing, I respectfully submit that there is probable cause to

believe that Marshall Dion possessed marijuana with the intent to distribute, in violation

of 21 U.S.C. §841(a)(1).

Respectfully submitted,

Tucker J. Heap
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on August 2, 2013:

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE

12