UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.: 13-CR-10258-DJC |
| | ) | |
| MARSHALL H. DION, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S GLOBAL OPPOSITION TO DEFENDANTS' MOTIONS TO
SUPPRESS EVIDENCE**

The United States of America, by Assistant United States Attorney Leah Foley, hereby respectfully seeks permission to late file this response to Defendant Marshall Dion's *Motion to Suppress (*Dkt. 122). The defense has assented-to the late filing of this opposition.  For the reasons stated herein, Defendant's motion should be denied.

## I.     INTRODUCTION

On June 18, 2013, Marshall H. Dion (herein referred to as "Dion" or "Defendant") was arrested in Junction City, Kansas and charged in state court with transporting drug proceeds. On August 5, 2013, the Honorable David H. Hennessey, Magistrate Judge for the District of Massachusetts, authorized a criminal complaint charging Marshall H. Dion with conspiracy to distribute marijuana, in violation of 21 U.S.C. §846 (Dkt. No. 13-mj-4114-DHH).  On September 5, 2013, a Boston, Massachusetts federal grand jury returned a three-count indictment, charging Marshall H. Dion, William Landolfi, and Glenn Freeman with conspiracy to possess with intent to distribute, and to distribute, one thousand kilograms or more of marijuana, in violation of 21 U.S.C. §846 (Count One); Marshall H. Dion with possession with intent to distribute marijuana, in violation of 21 U.S.C. §841(a)(1) (Count Two); William Landolfi with possession with intent

to distribute marijuana, in violation of 21 U.S.C. §841(a)(1) (Count Three); and Glenn Freeman with possession with intent to distribute marijuana, in violation of 21 U.S.C. §841(a)(1) (Count Four) (Dkt. # 13-10258-DJC).

The indictment charges that the conspiracy existed from at least in or about January 1994 and continued until on or about June 18, 2013.

**The Underlying Investigation**

On June 18, 2013, Officer Nicholas Blake of the Junction City Police Department ("JCPD") in Kansas, stopped a 2002 GMC Sierra pickup truck with Colorado license plates for speeding as the vehicle traveled on Interstate 70 in Junction City. The radar system in Officer Blake's patrol car showed that the truck was traveling at 80 miles per hour in a posted 75 mile per hour zone. Officer Blake pursued and stopped the truck, which was being driven by Dion. The entire car stop and subsequent interview was audio and video recorded by recording devices, which were mounted inside and outside of Officer Blake's cruiser. A copy of the recorded stop and interview is attached as Exhibit 1.[1] Officer Blake, a trained canine officer, had Figo, a canine trained in the detection of narcotics, in the rear of his cruiser at the time of the stop.

During the JCPD roadside interview, Dion presented Officer Blake with a valid Arizona driver's license, and explained that he was traveling from Pennsylvania en route to his home in Tucson, Arizona. Dion stated that he had residences in Massachusetts and Arizona and owned property in Colorado. Officer Blake informed Dion that he stopped him because he was speeding. Dion claimed that he was simply "following traffic." Officer Blake asked Dion to accompany him to his cruiser while Officer Blake ran a check on Dion's license. Officer Blake told Dion he was only going to issue a warning citation. Prior to Dion getting into the cruiser,

---

[1] The actual Exhibit 1 was filed with the court clerk.

Officer Blake asked Dion if he was carrying any weapons.  Dion replied that he was not and offered to allow Officer Blake to search his truck.  Officer Blake found this offer to be unusual.

While Officer Blake was waiting for the check on Dion's license to be completed, Dion chatted extensively with Officer Blake.  Dion explained that he had traveled from Arizona to Yardley, Pennsylvania to meet with his certified public accountant ("CPA").  Dion stated that he had been in Pennsylvania for three days and was driving home to Tucson.  Dion claimed that he traveled to Pennsylvania to meet with his CPA because she gives him "a break" on the charges.  Dion also said that he had slept at his CPA's house while in Yardley, although he denied being romantically involved with her.

During the stop, Officer Blake ran a routine check on Dion to determine whether Dion had any outstanding warrants or criminal record.  When this was explained, Dion admitted that he had been arrested for things, including the possession of marijuana about 20 years prior to stop.  Dion said he was no longer involved in the drug business.

Officer Blake detected signs of deception throughout the interview, including a travel itinerary that did not seem to make sense.  Officer Blake also noted that Dion appeared nervous, even after the officer told him that he would only be issuing a warning citation.  Officer Blake issued the warning citation to Dion and told him the traffic stop was over.  Officer Blake told Dion he could continue to stay and talk, and Dion agreed.  After talking about a few things unrelated to the stop, Officer Blake said, "Let me ask you this."  Dion responded, "You want to look in my truck?"  Officer Blake asked if he could and Dion replied, "Sure. I am telling you I am clean.  I've been out of the business. That was 23 years ago."

Upon opening the rear gate of the truck, Officer Blake observed several items that appeared to be random junk items and a refrigerator.  When Officer Blake asked Dion where

these items had come from, Dion said he picked them up in Boston.  This was the first time that Dion had mentioned being in Boston.  As Officer Blake continued to unload the items from the rear of Dion's truck, Dion said he wanted to get back on the road.  Officer Blake stopped searching Dion's truck and asked permission to walk his canine around the exterior of Dion's truck.  Dion agreed.

Officer Blake's canine, which was trained in the detection of narcotics, conducted an exterior sniff of Dion's vehicle.  The canine indicated around the area of the front driver side wheel well and in the area of the front bed on the passenger side.  When asked, Dion quickly denied that he had any illegal drugs in his truck.  When asked if he had large amounts of United States currency with him, Dion replied, "Pardon me?"  When asked again, Dion first answered that he did not, and then said he might have a couple deposits with him totaling $6,000.

Officer Blake continued the search of Dion's truck and located two FedEx boxes in front of a refrigerator.  These boxes contained a large amount of United States currency.  A second officer, who was assisting the search, located two additional boxes beside the refrigerator, which also contained a large amount of United States currency.  Three of these boxes had permanent marker writing on them that read "24 100s."  The fourth box was marked "9 100s."  A subsequent search revealed that these boxes contained $100 bills wrapped in stacks totaling $10,000 each, with bands that indicated the total.  Several other bundles of cash were also located within the truck.  A total of $828,220 was recovered from Dion's truck, $810,900 of which was in the FedEx boxes.  Dion was arrested and charged with transporting drug proceeds.

In addition to the cash, JCPD recovered from Dion's truck, among other items, a Garmin GPS device; a laptop computer; a cell phone; a set of Arizona license plates that were registered to Dion's truck; two padlock keys, one tagged "I-93" and the other "I-95," which were contained

inside an envelope along with a piece of paper with a type written note reading "re: Driving Trip: BRING KEYS FOR STORAGE UNIT"; deposit slips with bank account information; detailed travel logs that listed the trips and the routes that Dion took between Arizona and Boston (Exhibit 2); a "To Do" list for the trip between Tucson and Boston (Exhibit 3); a printed telephone contact list (Exhibit 4); and a mileage chart (Exhibit 5).

Post arrest, JCPD officers searched the phone, Garmin GPS device, and the laptop computer, all of which were recovered from Dion's truck at the time of his arrest, without a search warrant.   JCPD later obtained a state court authorized warrant to search the laptop computer and a more extensive search was conducted pursuant to that warrant.

JCPD notified the Tucson, Arizona DEA office about the traffic stop and subsequent arrest of Dion.   DEA, in turn, shared the information with HSI agents in Tucson, Arizona.   On June 27, 2013, an HSI agent contacted FBI Special Agent Stephen Kelleher to inform him that JCPD had seized approximately $800,000 from a vehicle driven by Marshall Dion and that Dion had been in Boston prior to the stop.

Acting on this information, Special Agent Kelleher called Officer Blake, who informed him that he had stopped Dion for speeding, that Dion had consented to a search of his truck, and that a canine had indicated on Dion's truck.   Officer Blake also informed Special Agent Kelleher that the search of Dion's truck revealed that he was transporting approximately $828,000 in United States currency, and that Dion was charged with transporting drug proceeds, a violation of Kansas state law.   The JCPD provided the FBI and DEA with copies of the documents found in Dion's truck, which included the travel logs detailing trips and routes that Dion took between Arizona and Boston, dating back to the early 1990s, and the printed contact list with the names, phone numbers and addresses of a number of people, including phone numbers and addresses for

Dennis Ditelberg, Marc Cantor, Glenn Freeman, and William "Bill" Landolfi.

On June 27, 2014, the JCPD also provided the FBI and DEA with certain locations they obtained from Dion's Garmin GPS device (herein, the "GPS device").[2]  Specifically, JCPD told the FBI that the GPS device indicated that Dion had arrived in Boston at 4 Longfellow Place on June 2, 2013, at approximately 10:08 p.m.; that on June 3, 2013, at approximately 6:29 a.m., Dion traveled to the Town and Country Self Storage, 130 Main Street, North Reading, Massachusetts, and remained there for approximately 30 minutes; and that Dion went to the Town and Country Self Storage a second time on June 6, 2013, and remained there for approximately 90 minutes.  The JCPD did not inform the FBI that they had searched the GPS device without a warrant.

### Dion's Jail Calls

While being held in Kansas, Dion made several calls from jail, all of which were recorded.  On June 28, 2013, Dion placed several calls from jail to co-defendant Glen Freeman. During one call, Dion reached Freeman's answering service and left a message telling Freeman that he (Dion) needed Freeman to contact "Dennis or Marc" because "they needed some help" from Freeman.  The FBI determined that Dion was referring to Dennis Ditelberg, Dion's brother-in-law, who is a civil attorney in Boston and the trustee of the Dion Family Trust.  Ditelberg's office was located at 4 Longfellow Place, Boston.  "Marc" is Ditelberg's law partner, Marc Cantor.  Later that day, Dion finally reached Freeman.  Freeman told Dion that he was "trying to call Dennis," but he had spoken to "Marc" instead.  Dion told Freeman that Marc "don't know anything."  Dion then told Freeman to call Marc again "on Monday" (July 1, 2013) because

---

[2] The JCPD sent the FBI a disc containing the evidence retrieved from the laptop computer pursuant to the state search warrant; however, much of the information could not be viewed because of the format of some of the files.

"they may need some money for attorneys for me, because they've locked up everything that I have, ok?"  Freeman responded, "Yep."  Dion then told Freeman, "I got stopped, and I was carrying money, and that's what I'm charged with."  Freeman responded, "Ok."  Dion then stated, "No drugs, so uh, we should be ok, I don't know.  But give Marc a call Monday, see if he needs any help from you."  Freeman responded, "Yeah, that's the first thing I asked Marc. 'Marc um, what do you want me to do?'  'Um, nothing.'  I said, um, 'Do you want me to go someplace?'  'No.'" Dion cut Freeman off by saying, "Nope, nope, nope, nope.  Ok.  This is not, this is not, wait a minute, this is not a secure phone so I can't talk with you."  Freeman replied, "Ok" and asked for further directions about who he should call on Monday.  Dion told Freeman to call Marc on Monday and "ask him what the procedure is," and Freeman responded that he would.

Later on June 28, 2013, Dion placed a recorded jail call to co-defendant Landolfi.  During the call, Dion referred to Landolfi by the name "Billy."  Dion asked Landolfi, "Did Dennis talk to you?"  Landolfi responded, "Yes" and Dion asked, "Can you hear me?"  When Landolfi responded by saying, "I said yes," Dion said, "Ok, can you, can you get that thing to Dennis for me?"  After a short pause Landolfi responded, "I'll take care of everything."  Dion responded, "Ok, I appreciate it, thank you very much."  Dion told Landolfi that Ditelberg would explain what had happened.  Landolfi asked Dion if he was "ok," and Dion responded by saying, "Yep, yep, oh no, I'm ok, but, but, I'm uh, you know, I'm in the, you know right now I'm in the locked up, and that thing that, that thing that uh, er, uh, that box that you have of mine I want you to give that to Dennis.  Ok?" Landolfi responded, "I understand, I understand, I understand."

Dion also placed several recorded calls to Dennis Ditelberg.  On June 19, 2013, Dion called Ditelberg at his law office to inform him that he had been arrested in Kansas after police

stopped him and discovered that he was traveling with money.  In another call on June 28, 2013, Dion called Ditelberg's office and spoke with Marc Cantor.  Dion told Cantor that he had been charged in Kansas and that he was trying to get in touch with "Billy."  Cantor told Dion that the FBI had just visited the law office and had met with Ditelberg.[3]  Dion audibly sighed. Ditelberg picked up the call and told Dion that he had had "visitors."  Dion replied that Cantor had told him.  Ditelberg told Dion, "They are talking about money laundering. I will try to stall them."  Ditelberg told Dion, "They have your log.  When you were in and out of the office." Dion replied, "The log was trips made back and forth."  Dion assured Ditelberg it was "not a daily log."

Dion asked Ditelberg what questions the FBI had asked. Ditelberg said they were asking about the trust and what he knew about Dion.  Ditelberg mentioned the "log" again, and Dion said, "Billy said he'd be in touch with you.  The log is my travels across country. . . I log in when I arrive in Boston and log in when I leave."  Ditelberg told Dion the log was more particular and detailed the places Dion traveled.  Dion replied, "No. That doesn't exist. I wouldn't keep anything like that. When I'm in town, I don't keep anything about where I go."  Ditelberg said, "Only telling you what they said." Dion told Ditelberg "They're baiting you."

In another call later on June 28, Dion asked Ditelberg if he had "Billy's number."  Dion said, "He can come through for me. He owes me."  Ditelberg said he wanted to get "Billy" and "Glenn" together so they could all "talk to a lawyer."  Dion told Ditelberg, "I know Billy can help you out.  He has funds that belong to me."

**FBI Interviews**

---

[3]  Indeed, the FBI had interviewed Ditelberg that same day in Ditelberg's law office at 4 Longfellow Place.

On June 28, 2013, FBI agents interviewed Dennis Ditelberg at his law office. As indicated above, this interview occurred prior to the FBI reviewing the recorded jail calls. During the interview, Ditelberg denied any specific knowledge about what Dion did for a living. Ditelberg admitted that he let Dion use an office within the law office, and claimed he believed Dion was in "sales." Ditelberg denied ever giving Dion any money.

On July 1, 2013, FBI agents interviewed Landolfi at his residence after reviewing Dion's jail calls to Ditelberg, Freeman and Landolfi, and locating Landolfi's address and cell phone number in the contact list found in Dion's truck at the time of his arrest. Landolfi told agents that an "attorney" had told him that Dion "got in trouble" in Kansas. Landolfi could not recall the name of the attorney. Landolfi was asked when he had last spoken with Dion, Landolfi responded, "A long time ago." When Landolfi was confronted with the fact that he had talked to Dion in a recorded jail call only three days earlier, Landolfi admitted that he had talked to Dion recently. Landolfi was asked if he had any property belonging to Dion and Landolfi stated that he did not.

Landolfi was asked about the "box" that Dion referred to in the recorded jail call, and he claimed that he did not know what Dion was talking about during the call. Landolfi was reminded that he had responded, "I'll take care of everything" and "I understand, I understand, I understand." Landolfi claimed that he had no idea what Dion was talking about during the call. Landolfi was asked if he had given any property or money to any attorney, and he said that he had not.

Landolfi said that an "attorney" had called to ask if he could help Dion, but Landolfi said that he had no way to help and could not recall the name of the attorney who had called. Landolfi eventually recalled that it was Dennis Ditelberg who had called him about Dion's

arrest.  Landolfi denied renting a storage unit at Town and Country Self Storage and stated he had never been there.  Near the end of the interview, Landolfi stepped inside his home and called a lawyer.  After answering more questions, Landolfi told agents he no longer wanted to answer questions.

**Search Warrants**

**Dion**

On Tuesday, July 2, 2013, the FBI served a subpoena on Town and Country Self Storage for a list of all current renters of storage units at the facility.  This location was identified by the information provided by the JCPD.  A review of the list provided by Town and Country Self Storage revealed that both Dion and Landolfi rented storage units at Town and Country Self Storage (units #220 and #574, respectively).  According to Town and Country Self Storage records, Dion had rented a unit there since 1999, and Landolfi had rented a unit there since 2008.

Investigators summoned a Massachusetts State Police canine unit to Town and Country Self Storage in order to conduct an exterior sniff of the areas,[4] which included units rented by Dion and Landolfi.  The canine, which was trained in the detection of narcotics, alerted at Dion's unit.  Based on this positive alert, the Middlesex District Attorney's Office obtained a search warrant for Dion's storage unit, which resulted in the seizure of $11,519,900 in United States Currency, approximately 168 pounds of high-grade marijuana, freezers, and ledgers and records related to Dion's drug distribution operation.

Among the records seized from Dion's Town and Country Self Storage unit were detailed

---

[4]  The canine was directed to conduct an exterior sniff around two blocks of ten storage units. One block contained the unit that belonged to Dion and the other block contained the unit belonging to Landolfi.  The canine handler was not told which units belonged to either Dion or Landolfi prior to the sniffs.

records of customers, including amounts of marijuana sold and cash balances, as well as airline, bank, and rental car records, and pieces of mail addressed to Dion.  A review of these records indicated that Dion had been trafficking in large amounts of marijuana since at least 1992. Among the customers identified in Dion's records were individuals referred to as "Billy L," "Glen" and "Eddie."  As explained below, agents believe that "Billy L" is a reference to William "Billy" Landolfi; "Glenn" is a reference to Glenn Freeman, and "Eddie" is a reference to Eddie Weisberg.

Dion's drug records included notations regarding "Billy L" that indicated the following:

12/24/2003 Balance owed of $159,865, payment of $179,820, which resulted in a credit balance of $19,955.

10/20/2003 Balance owed of $205,954, payment of $80,000, which resulted in a balance owed of $125,954.

9/23/2003 Balance owed of $439,341, payment of $420,070, which resulted in a balance owed of $19,271.

Dion's drug records included notations regarding "Glen" that indicated the following:

12/26/2003 Balance owed of $46,894, received marijuana worth $26,702.50, which resulted in a balance owed of $73,596.50, payment of $30,000, which resulted in a balance owed of $43,596.50.

11/28/2003 Balance owed of $45,750, received marijuana worth $28,925, which resulted in a balance owed of $74,675, and a payment of $7,550, resulting in a final balance owed of $67,125.

10/22/2003 Balance owed of $52,518.50, received marijuana worth $11,731.50, which resulted in a balance owed of $64,050, and a payment of $18,300, which resulted in a balance owed of $45,750.

These handwritten ledgers included comments such as "mid range" and "downgrade due to shake."  Agents interpreted these comments as references to the quality of the marijuana supplied by Dion.

11

Among the records discovered in Dion's unit was a checkbook ledger with entries dated from 1996-1998, including several entries detailing yearly rental payments to several storage facilities, including Comeau's Mini Storage in Saugus, Massachusetts.  Comeau's Mini Storage confirmed that Dion was a longtime customer and currently had a storage unit at the facility.  A state search warrant for Dion's storage unit at Comeau's Mini Storage was obtained, the execution of which resulted in the seizure of an additional $136,822 in United States Currency and an additional 227 pounds of high-grade marijuana.

On October 29, 2013, the Honorable Marianne B. Bowler authorized a warrant for the search of the Garmin GPS device, cell phone and laptop computer found in Defendant's truck at the time of his arrest, and the search of the Defendant's office, located at 4 Longfellow Place, Boston (Dkt. Nos. 13-mj-2376-2381-MBB).  On October 31, 2013, Magistrate Judge Bowler authorized warrants allowing for the search of additional computers and electronic storage devices seized during the search of 4 Longfellow Place.  Agents recovered numerous documents and records from the electronic storage devices, computers, phones and the GPS device relating to the Defendant's drug trafficking operations.

**Landolfi**

On July 5, 2013, Magistrate Judge David H. Hennessy authorized a warrant for the search of Landolfi's unit at the Town and Country Self Storage facility.  Agents executed the search warrant that same day and found a white chest-type freezer similar in style and appearance to freezers that were found in Dion's unit at Town and Country.  Inside the freezer, which was plugged in and operational, agents recovered three ten-pound packages of marijuana wrapped in a silver foil-type material, and several clear plastic bags also containing marijuana.  Agents also recovered a thirty gallon, brown Rubbermaid storage tote containing several clear plastic bags of

marijuana.  These packages had white tape with the names of the types of marijuana written on them.  These names included, "Bubble Gum," "Mr. Nice," "OG Chemical," and "Pineapple Mist."  Agents also recovered scales and packaging materials and a U.S. Postal Service shipping label bearing the addressee name "William Landolfi" and the address "230 Haverhill Street, North Reading, MA."  Approximately 75 pounds of marijuana was seized from the unit.

After searching Landolfi's unit, Judge Hennessy authorized the search of Landolfi's residence, located at 230 Haverhill Street, North Reading, Massachusetts.  Agents recovered financial records, which showed balances near $1 million.

On July 16, 2013, Magistrate Judge Hennessy authorized the search of Landolfi's safe deposit box, and on July 17, 2013, agents recovered $195,001 from the box, which had been identified through grand jury subpoenas.

### Arizona - Ditelberg

The JCPD officers forwarded to the DEA in Arizona location information they had recovered from Dion's GPS device.  FBI agents also forwarded to DEA agents in Tucson, Arizona location information found during the searches of Dion's units.  DEA agents sought and obtained federal search warrants for two residences and three storage units belonging to Dion in Tucson, Arizona.  As a result of the execution of those search warrants, the DEA seized $888,432 in United States currency from Dion's residences and storage units. In total, the DEA searched 12 properties in Arizona owned by Dennis Ditelberg as the trustee for the Dion Family Trust.  In one of the buildings owned by Dennis Ditelberg, agents discovered that the building was used as a central packaging center, equipped with trash compactors, packaging materials and marijuana residue scattered inside.

**Freeman**

On July 19, 2013, Magistrate Judge Hennessy authorized search warrants for three safe deposit boxes in Glenn Freeman's name.  Agents recovered over $350,000 in cash from the three boxes.

On July 23, 2013, Magistrate Judge Hennessy authorized a search warrant for Freeman's residence. Agents found and seized approximately 10 pounds of marijuana, scales, packaging materials, and what appeared to be drug ledgers that recorded names with corresponding monetary amounts.  Agents also recovered nine firearms and approximately $95,317 in cash from Freeman's residence.  Agents also recovered a key to a safe deposit box located at a different bank.  Pursuant to a search warrant, agents recovered approximately $20,000 from this fourth safe deposit box.  In total, agents recovered $449,667 from Freeman's residence and four safe deposit boxes.

## II.    ARGUMENT

Defendant challenges the traffic stop, the search of his truck, the warrantless search of the GPS device found in his truck incident to arrest and, all subsequent searches conducted pursuant to warrants authorized by state and federal courts.  The defendant also seeks to suppress all statements he made both before and after his arrest.[5]  As explained below, each of defendant's challenges are without merit and should be denied.

---

[5] The government is not seeking to introduce in its case-in-chief any statements made by Defendant after his arrest.  Accordingly, the government does not respond to the arguments raised by the Defendant about whether he invoked his right to counsel after he initially waived his Miranda rights.

*1. The initial traffic stop was lawful.*

A traffic stop is validly executed if it is "supported by reasonable suspicion that a traffic violation has occurred." *United States v. Chaney*, 584 F.2d 20, 24 (1st Cir. 2009); *accord United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008) ("A traffic stop is justified at its inception 'if the officer has either (1) probable cause to believe a traffic violation has occurred or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'").[6] Here, Officer Blake will testify that he stopped Defendant after the radar equipment in his cruiser indicated that Defendant was driving 79/80 miles per hour in a 75 mile per hour zone. Defendant provides no affidavit or evidence to challenge Officer Blake's observations or reliance on the radar equipment in his car. As depicted in Exhibit 1, Officer Blake explained to Defendant that he was speeding. Defendant did not contest that he was speeding, but rather explained that he was simply "following traffic." This evidence is sufficient to demonstrate reasonable suspicion warranting the initial stop. *See United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993) (stating that the police officer's traffic stop following a radar reading showing that the defendant was traveling 75 MPH in a 65 MPH zone was "clearly supported by a reasonable suspicion").

---

[6] Because this case involves the introduction of evidence in a court within the jurisdiction of the First Circuit, the question of admissibility is properly analyzed under First Circuit law. To the extent that the court considers, however, whether Officer Blake or other members of the JCPD acted in good faith, the question may arise whether their actions were consistent with governing authority in the location where those actions took place. *See United States v. Sparks*, 711 F.3d 58, 63-64 (1st Cir. 2013) (noting that, where the government argues that an action was taken in good faith reliance on then-existing precedent, it is unclear whether a court may look beyond the jurisdiction where the actions took place to consider reliance on non-binding precedent from other jurisdictions). The government therefore, where possible, provides parallel citations to Tenth Circuit precedent.

2.  *The duration of the traffic stop and questioning of the Defendant during the stop was permissible.*

Defendant takes issue with Officer Blake's request that the Defendant accompany him in his cruiser while he checked the Defendant's license and background.  However, the First Circuit held in *United States v. Dunbar* that the fact that a person stopped for a traffic infraction "was placed in the back of a police cruiser does not elevate the detention beyond a *Terry* stop."  553 F.3d 48, 56 (1st Cir. 2009) (citation omitted); *accord United States v. Vargas*, 57 Fed. Appx. 394, 399 (10th Cir. 2003) (holding that officer's "decision to direct [the Defendant] to sit in the front seat of the squad car was reasonable" to promote officer safety and for investigatory reasons).

Next, the Defendant argues that the duration of the pre-search questioning and detention violated the Fourth Amendment because the scope of the detention was not reasonably related to the justification of the traffic stop.  These arguments are also unavailing in light of *Dunbar*, which made clear that "routine questioning about itinerary" and other routine inquiries are a permissible part of a stop even if unrelated to the reason for the stop.  553 F.3d at 56; *accord United States v. Blackburn*, 64 Fed. Appx. 190, 195 (10th Cir. 2003) (holding that questions relating to travel plans and vehicle ownership are "within the legitimate scope of [a] traffic stop").  It is also well established that an officer's questions may become intrusive, and the stop extended, if the defendant's initial answers arouse suspicions.  *See United States v. Chhien*, 266 F.3d 1, 9-10 (1st Cir. 2001); *accord Soto*, 988 F.2d at 1556 (officer's credible testimony that a defendant appeared nervous contributed to a finding that there existed a "reasonable suspicion" sufficient to support more expansive questioning, including in regards to whether the defendant possessed narcotics or weapons).

16

As depicted in Exhibit 1, the conversation between Officer Blake and the Defendant was never one-sided or confrontational.   Defendant acquiesced and fully participated in the conversation and voluntarily offered information.   Moreover, as the conversation developed, Officer Blake obtained information that reasonably caused him to become suspicious of the Defendant's answers.   For example, when asked about his travel plans, Defendant told Officer Blake that he drove from Arizona to Pennsylvania to meet with his CPA because she gave him a "break" on her charges.   Defendant claimed that he stayed in Pennsylvania for three days after traveling from Arizona for two weeks.   Defendant told Officer Blake that he stayed at his CPA's residence, but denied being romantically involved with her.   Moreover, Officer Blake detailed in his report and will testify that he observed several indications that the Defendant was acting unusual and appeared "very nervous" throughout the questioning.   The scope and nature of Officer Blake's questioning was clearly reasonable in light of these circumstances.

Defendant's argument that the length of the traffic stop was prolonged by the questions posed by Officer Blake is also belied by the video of the stop (Exhibit 1).   Officer Blake immediately inquired about the status of Defendant's license and ran a routine criminal history check.   While Officer Blake waited for these responses, he engaged the Defendant in conversation.   Indeed, after the stop was terminated and the Defendant was free to leave, he voluntarily chose to continue his conversation with Officer Blake.   Given Defendant's voluntary decision to stay and continue the conversation, it can be questioned whether Officer Blake's inquiries past that point are subject to Fourth Amendment scrutiny at all, at least until the Defendant indicated that he no longer wished to talk.   *See United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997) (noting that "[p]olice may approach citizens in public places and ask them questions without triggering the protections of the Fourth Amendment"); *accord Blackburn*, 64

17

Fed. Appx. at 194 (court may continue detention where "the initial detention has become a consensual encounter").

Even assuming, *arguendo*, that Officer Blake purposefully prolonged the stop to question the Defendant, such questioning was appropriate in light of the Defendant's odd responses to routine questions and his nervous demeanor during the stop. Deciding whether a stop was reasonable in light of the circumstances requires "a practical commonsense judgment based on the idiosyncrasies of the case at hand and an assessment whether the officer's actions were fairly responsive to the emerging tableau." *United States v. Hornbecker*, 316 F.3d 40, 47 (1st Cir. 2003) (internal quotation marks omitted). As detailed above, during the course of Officer Blake's interaction with Defendant, Defendant made several statements and exhibited extreme nervousness that led to Officer Blake developing an objectively reasonable articulable suspicion that Defendant was engaged in illegal activity beyond the traffic stop.

First, Defendant offered to allow Officer Blake to search his truck soon after the traffic stop began. Officer Blake found this unusual in light of the fact that he had not asked to search the Defendant's truck and had told the Defendant he was only intending to issue the Defendant a warning citation for speeding. In addition, Defendant gave a bizarre account of his travel itinerary and purpose of his travel. Moreover, Defendant was driving a vehicle with out-of-state license plates, which can be a pertinent factor in the reasonable suspicion calculus. *See United States v. Walker*, 924 F.2d 1, 4 (1st Cir. 1991); *see also United States v. Quintana-Grijalva*, 332 F. App'x 487, 495 (10th Cir. 2009) (similar). When considering the totality of the circumstances, Officer Blake acted lawfully when he expanded his inquiry to include questions relating to Defendant's history and criminal record. While Officer Blake awaited information from the dispatcher, Defendant mentioned his age more than once, which Officer Blake

interpreted as a ploy to seek his sympathy.  Even after Officer Blake assured Defendant he was only planning to issue him a warning citation, Defendant exhibited signs of nervousness, so much that Officer Blake observed his pulse pounding in his stomach area and carotid artery. These facts justified an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring.

   3.  *Defendant consented to the search of his vehicle.*

   Defendant further argues that the search of his vehicle was non-consensual and therefore violated the Fourth Amendment.  This argument is belied by the facts and lacks merit.  In fact, the Defendant repeatedly voluntarily consented to the search of his truck – once approximately three minutes into the stop, and then again, after the traffic stop had terminated and the Defendant was free to leave, approximately 22 minutes after the initial stop.

   To the extent Defendant suggests that his consent was involuntary, he is wrong.  In the First Circuit, the voluntariness of consent to a search "is a question of fact to be determined from an examination of the totality of circumstances." *United States v. Chaney*, 647 F.3d 401, 407 (1st Cir. 2011) (internal quotation marks and citation omitted).  The factors considered include "the suspect's age, education, experience, knowledge of the right to withhold consent, and evidence of coercive tactics." *Id.* (internal quotation marks and citation omitted).  Here, it cannot plausibly be argued that Defendant's consent was coerced, since Defendant initiated the offer that Officer Blake could search his vehicle. *See, e.g.*, *Blackburn*, 64 Fed. Appx. at 195-96 (holding defendant's consent as consensual when he said, "Go ahead" after officer requested to search vehicle).  Moreover, the circumstances support the conclusion that Defendant was in a position to knowingly waive his rights, especially in light of his acknowledged criminal history. See *Chaney*, 647 F.3d at 407-08 (noting that officers are not required to expressly state that

consent may be refused and that a defendant's prior encounters with police weigh against a finding that consent was coerced.

After Officer Blake told the Defendant that the traffic stop was over and that he was free to leave, Defendant agreed to continue his conversation with Officer Blake.  After talking about a few things unrelated to the stop, Officer Blake said, "Let me ask you this."  Defendant responded, "You want to look in my truck?"  Officer Blake asked if he could and the Defendant replied, "Sure. I am telling you I am clean.  I've been out of the business. That was 23 years ago."  Defendant was referring to his prior involvement in drug dealing.

Upon opening the rear gate of the truck, Officer Blake observed several items that appeared to be random junk items and a refrigerator, which Officer Blake believed was a cover load.  When Officer Blake asked Defendant where these items had come from, Defendant said he had picked them up in Boston.  This was the first time that Defendant had mentioned being in Boston.  As Officer Blake continued to unload the items from the rear of Defendant's truck, Defendant said he wanted to get back on the road.  Officer Blake stopped searching the truck and asked permission to walk his canine around the exterior of the truck.  The Defendant agreed.

Officer Blake's canine, which was trained in the detection of narcotics, conducted an exterior sniff of the vehicle.  The canine indicated around the area of the front driver side wheel well and in the area of the front bed on the passenger side.  When asked, the Defendant quickly denied that he had any illegal drugs in his truck.  When asked if he had large amounts of United States currency with him, Defendant replied, "Pardon me?"  When asked again, Defendant first answered that he did not, and then said he might have a couple deposits with him totaling $6,000. At this point, Officer Blake had probable cause to search the Defendant's truck. *United States v.*

*Rosborough*, 366 F.3d 1145 (10th Cir. 2004) (a dog alert creates general probable cause to search a vehicle).

Officer Blake continued the search of the truck and located two FedEx boxes in front of a refrigerator. These boxes contained a large amount of United States currency. A second officer, who was assisting the search, located two additional boxes beside the refrigerator, which also contained a large amount of United States currency. Three of these boxes had permanent marker writing on them that read "24 100s." The fourth box was marked "9 100s." A subsequent search revealed that these boxes contained $100 bills wrapped in stacks totaling $10,000 each, with bands that indicated the total. Several other bundles of cash were also located within the truck. A total of $828,220 was recovered from Dion's truck. Defendant was arrested and charged with transporting drug proceeds.

    4.    *The Officers acted in good faith when they searched the GPS found in the Defendant's truck.*

As detailed above, during the search of Defendant's truck, officers recovered a number of documents detailing the Defendant's numerous trips between Arizona and Boston, a phone list which contained contact information for his customers, a cell phone, a Garmin GPS device, and a computer. The JCPD searched the phone, GPS device, and the laptop computer without a search warrant.[7] After an initial search of the laptop computer, JCPD obtained a search warrant to search the laptop computer thoroughly. At the time of the search of the GPS device, JCPD officers, relying on the existing case law at the time, believed they could search the GPS device

---

[7] The FBI did not have any information about what was extracted from the Defendant's phone prior to obtaining the Massachusetts search warrants at issue in this case, and none of the information from the computer was used to obtain search warrants. Accordingly, the government limits its discussion to the warrantless search of the GPS device found in Defendant's truck at the time of his stop.

without a warrant.  The JCPD forwarded some of the information it had extracted from the GPS to the FBI in Boston, which agents used to locate the Town and Country Storage facility that was ultimately searched.

It is worth noting that that the search of the Garmin GPS device is simply not like the search of a cell phone because the particular GPS device at issue does not have the capacity to store the breath of personal information that a cell phone can store.  The only information extracted from the GPS device was geographical coordinates and the times that the vehicle had been to those places.  The government has not identified any cases addressing the warrantless search of a GPS device either incident to arrest or pursuant to the automobile exception to the warrant requirement.  However, as explained below, at the time the GPS device was searched, locally-relevant precedent supported the substantially greater intrusion of a search of a cell phone incident to arrest or pursuant to the automobile exception.  Accordingly, the JCPD officers were plainly justified in performing the less-intrusive search of the GPS device.

At the time of the search in June 2013, a number of decisions in the Tenth Circuit upheld warrantless searches of the contents of cell phones either incident to an arrest or pursuant to the automobile exception.  In 2009, the Tenth Circuit stated clearly that "the permissible scope of a search incident to arrest includes the contents of a cell phone found on the arrestee's person." *See Silvan W. v. Briggs*, 309 Fed. Appx. 216, 225 (10th Cir. 2009).  Although this case was unpublished, it was in line with case law in the Fifth and Seventh Circuits at the time and with the generally accepted practice that allows officers to search containers in a person's possession at the time of arrest.  *See United States v. Donnes*, 947 F.2d 1430, 1437 (10th Cir.1991) (recognizing that "a search incident to a lawful arrest permits a law enforcement officer to

conduct a warrantless search of a container located in the area of the arrestee's immediate control").

In addition, at the time of the search, Tenth Circuit case law further sanctioned warrantless searches of the contents of a cell phone pursuant to the automobile exception, which generally allows the search of any part of the car where evidence may be found if a search is justified. *See United States v. Burgess*, 576 F.3d 1078, 1090 (10th Cir. 2009) (court suggested that a limited on-site examination of a hard drive was akin to searching a cell phone for recent calls). In *Burgess*, the Court considered whether a search of a computer was sanctioned by *California v. Acevedo*, 500 U.S. 565 (1991), which allowed the search of all containers suspected of carrying contraband found in an automobile. The case was ultimately decided on other grounds.[8]

In addition, at the time of the JCPD search, a number of Kansas district court decisions had upheld an officer's warrantless search of a cell phone found in the car of an arrestee at the time of arrest or pursuant to the automobile exception. For example, in *United States v. Rocha,* 2008 WL 4498950 (D. Kan. Oct. 2, 2008), officers obtained consent to search a vehicle that had been stopped for a routine traffic violation. After officers discovered cocaine hidden in a compartment, they placed the occupants of the vehicle under arrest and searched the four cell phones that were found inside the vehicle. The officers recovered contact lists, numbers dialed and recent calls from each of the phones. A defendant moved to suppress evidence seized from his cell phone recovered from the vehicle, claiming the warrantless search violated the Fourth

---

[8] Case law in the First Circuit is consistent with that in the Tenth Circuit. *See United States v. Goncalves*, 642 F.3d 245, 250 (1st Cir. 2011) (noting that "if probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search") (*quoting Wyoming v. Houghton*, 526 U.S. 295, 301 (1999)).

Amendment.  The court found that because probable cause existed to believe that evidence of a crime would be found in the cell phone, the automobile exception allows the search of cell phones just as it allows a search of other closed containers found in vehicles.  *See also United States v. Fierros–Alvarez*, 547 F.Supp.2d 1206, 1213–14 (D. Kan. 2008) (the transportation of personal belongings in an automobile substantially diminishes a person's privacy expectations, and courts generally have not been inclined to suspend general Fourth Amendment jurisprudence on exceptions to the search warrant simply because the container is a cellular telephone).

At the time of Dion's arrest, officers had reason to believe Dion was involved in a drug conspiracy based on the amount of money he was transporting and the fact that he lied about the purpose of his cross-country trip.  Large amounts of cash are often considered to be "drug paraphernalia" along the same lines as weighing scales and firearms. *United States v. Mullane*, 480 F. Appx. 908, 911 (10th Cir. 2012); *see also United States v. Martinez*, 938 F.2d 1078, 1083 (10th Cir. 1991), *United States v. Hall*, 473 F.3d 1295, 1304 (10th Cir. 2007).

Based on the amount of cash recovered from the Defendant's truck along and the fact that he had lied about the purpose of his travel, it was reasonable for JCPD officers to believe the coordinates in the GPS device could lead to evidence of a crime or to others involved in the conspiracy.  Likewise, based on applicable case law in June 2013, it was reasonable for JCPD officers to believe they could search the contents of the GPS device, whether incident to Defendant's arrest or pursuant to the automobile exception, for evidence of illegal activity.  This reliance on existing case law and good-faith belief that they could search the GPS device further explains why JCPD officers did not inform Special Agent Kelleher that they searched the GPS without a warrant.  At no time did Officer Blake believe he had violated the Fourth Amendment, and the controlling case law supports that belief.

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."   *Herring v. United States*, 555 U.S. 135, 144 (2009). Suppression may therefore be warranted "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."   *Id.*; *Davis v. United States*, 131 S. Ct. 2419, 2427 (2011).   "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way."   *Davis*, 131 S. Ct. at 2427-2428 (internal citations and quotation marks omitted).

The Tenth Circuit has held that evidence obtained by police through a warrantless search authorized by controlling case law can still be admitted under the good faith exemption if the relied upon case law is subsequently overruled.   *United States v. McCane*, 573 F.3d 1037, 1040 (10th Cir. 2009) (holding that evidence obtained by an officer who "reasonably relied upon settled pre-Grant Tenth Circuit case law" to conduct a warrantless search could be admitted as evidence under the good faith exemption after Grant overturned the cases upon which the officer relied).   Accordingly, even if the Supreme Court's recent decision in *Riley v. California*, 134 S. Ct. 2473 (2014) would be determined to cover searches of a GPS device like the one at issue here, it would not warrant suppression in this case in light of the state of the law at the time of the JCPD search of the GPS device.

> 5.      *The FBI acted reasonably when it relied on the information JCPD provided to secure a search warrant.*

Special Agent Kelleher had no reason to believe that the information given to him by the JCPD had been obtained improperly.   Acting on information he received from the DEA and HSI,

Special Agent Kelleher called Officer Blake, who informed him that he had stopped Dion for speeding, that Dion had consented to a search of his truck, and that a canine had indicated on Dion's truck.  Officer Blake further informed agent Kelleher that they recovered approximately $828,000 from Dion's truck, and that Dion had been charged with transporting drug proceeds, a violation of Kansas state law.   The JCPD provided the FBI and DEA with copies of the documents they had found in the Defendant's truck (including Exhibits 2-5), which included travel logs detailing trips and routes that the Defendant had previously taken between Arizona and Boston, Massachusetts, two padlock keys, one tagged "I-93" and the other "I-95," which were contained inside an envelope along with a piece of paper with a type written note reading "re: Driving Trip: BRING KEYS FOR STORAGE UNIT, and a printed contact list with the names, phone numbers and addresses of a number of people, including numbers and addresses for Dennis Ditelberg, Marc Cantor, Glenn Freeman, and William "Bill" Landolfi.  The JCPD also gave FBI agents the recorded jail calls between the Defendant and Ditelberg, Cantor, Freeman and Landolfi, all of which are described above.

The JCPD also provided the FBI with certain locations they had obtained from Dion's GPS device, including the address of the Town and Country Self Storage facility located at "130 Main Street, North Reading, Massachusetts."[9]   Acting on this information, Special Agent Kelleher served a subpoena on the Town and Country Storage facility to obtain a list of names of persons who rented units at the facility.   The list showed that both the Defendant and co-defendant Landolfi rented units at the facility.  Agents then interviewed Landolfi, who lied about talking to the Defendant and renting a unit at the facility.  Agents then requested that the Massachusetts State Police send a canine to the Town and Country Storage facility to conduct an

---

[99] FBI agents later determined that the actual address was 140 Main Street.

exterior sniff of two blocks of units.  After the canine alerted on the Defendant's unit, agents obtained a search warrant and searched the Defendant's unit.

As explained above, the facts demonstrate that the JCPD officers acted in objectively reasonable reliance on judicial precedent in searching the GPS device without a warrant.  Thus, that information is admissible under the good-faith exception, and the derivative information should also be admissible because that information is even less closely related to the purported illegality and suppressing it would not serve the deterrent purposes of the exclusionary rule.  *See, e.g.*, *Herring*, 555 U.S. at 147-148 (fruits of search incident to arrest admissible where arrest, though illegal, was premised on good-faith belief that arrest warrant was valid); *United States v. Crews*, 502 F.3d 1130, 1135-1136 (9th Cir. 2007) (reversing order suppressing gun found during illegal search of defendant's apartment and defendant's subsequent derivative statements, where search was conducted in good-faith reliance on invalid warrant).

Law enforcement officers acted reasonably at each step while conducting their investigations.  FBI agents did not learn until after the search warrants were executed that the JCPD had searched the GPS device without a warrant. After they learned this, they obtained a warrant to search the GPS device based solely on the money and documentary evidence found in the Defendant's truck at the time of his stop and the recorded jail calls to coconspirators.

The exclusionary rule is designed to deter police misconduct.  The Supreme Court has held that "when police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police 'acted in objectively reasonable reliance' on the subsequently invalidated search warrant."  *Herring*, 555 U.S. at 142 (quoting *Unites States v. Leon*, 468 U.S. 897, 922 (1984)).  This objective standard asks the Court to determine "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of

the circumstances'" *Id.* (quoting *Leon*, 468 U.S. at 922).  The Court based this exemption on the factors determining when the exclusionary rule should be applied: (i) when its use would deter Fourth Amendment violations in the future, (ii) and when the "benefits of this deterrence outweigh the [social] costs" that result from limiting police in their pursuit of the guilty. *Id*. at 141 (quoting *Leon* 468, U.S. at 909, 910).

The Court has held that the good faith exemption applies when a warrantless search is invalid as a result of negligence on the part of another police agency as opposed to reckless or deliberate actions.  *Herring*, 555 U.S. at 147 (holding that the good faith exemption allowed for the admissibility of evidence resulting from the warrantless search of a suspect incident to his arrest on the basis of an arrest warrant from another jurisdiction, at the time recalled, that still mistakenly appeared in a warrant database).  The Court ruled the good faith exemption applied in *Herring* because such negligent errors do not rise to the level of a Fourth Amendment violation.  As such, excluding the evidence in *Herring* would have no deterrence effect on future Fourth Amendment violations. *Id.* at 145-46.

As discussed by the First Circuit in *United States v. Thomas*, 736 F.3d 54, 60 (1st Cir. 2013), *Herring* explained that application of the exclusionary rule is only warranted where the officer's conduct represents "deliberate, reckless, or grossly negligent conduct" and where there is a sufficiently close connection between the wrongdoing and the evidence that suppression will have a deterrent effect.  Here, both factors are absent.  First, existing law (including law government automobile searches, law governing the scope of consent, and law governing telephone searches) provided sufficient justification for the search that it cannot be considered to represent "deliberate, reckless, or grossly negligent conduct."

Second, there is a significant element of attenuation here, since the Boston FBI agents, relying on information passed by another law enforcement office, had no reason to know that a possible unconstitutional search had occurred. Rather, they reasonably acted on the information they had been given. The facts in this case are somewhat analogous to *Herring* itself, where a person was stopped based on a warrant that should have been recalled but had not been removed from the database. Here, FBI agents lawfully obtained a list of occupants from the Town and Country Storage facility after learning that the Defendant had visited the location twice prior to his arrest. Given the JCPD's belief that they did not need a warrant to search the GPS device, there was nothing nefarious, negligent or reckless in their failure to inform the FBI how it had searched the GPS without a warrant. Indeed, the JCPD obtained a search warrant to search the computer found in the Defendant's truck, but not the cell phone and GPS, which further bolsters the argument that they did not believe, based on existing law, that a warrant was required to search the phone and GPS device at that time. Given this reasonable belief, any link between the constitutional wrong and suppression of the evidence obtained from the storage unit would lack meaningful deterrent effect, and is thus unwarranted.

6. *The evidence would have inevitably been discovered and thus, suppression is not warranted.*

If the Court finds that the traffic stop and subsequent search of the Defendant's truck were valid, all of the evidence that Defendant seeks to suppress would be admissible pursuant to the inevitable discovery doctrine. In *Nix v. Williams*, the Supreme Court adopted the "ultimate or inevitable discovery exception to the Exclusionary Rule." *See Nix v. Williams*, 467 U.S. 431, 443-44 (1984). As the Court noted, "[e]xclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial . . . [n]or would

29

suppression ensure fairness." *See id.* at 446-47.   Similarly, the First Circuit has held that, "[e]vidence which comes to light by unlawful means nonetheless can be used at trial if it ineluctably would have been revealed in some other (lawful) way." *See United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994).   In the First Circuit, application of the inevitable discovery doctrine permits trial-use of otherwise inadmissible evidence where: (1) the lawful means of its discovery are independent and would necessarily have been employed; (2) discovery by that means is in fact inevitable; and (3) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment. *Id.*  These circumstances were met here.

As set forth above, the incriminating documents and records found in the Defendant's truck in addition to the $828,000 would have established probable cause to search the phone, GPS device and laptop computer.  After FBI agents learned that the warrantless search of the GPS device could be problematic, they applied for a search warrant without relying on the derivative evidence (the money and drugs found in the storage facilities) to prove probable cause.  On October 29, 2013, Magistrate Judge Bowler authorized a warrant to search the cell phone, GPS device and laptop computer found in Defendant's truck based on the documentary evidence and cash found in the Defendant's truck at the time of his stop and the recorded jail calls between the Defendant and his coconspirators.  Thus, discovery of the evidence was plainly "inevitable."

Application of the inevitable discovery doctrine in this context, moreover, would not "provide an incentive for police misconduct or significantly weaken fourth amendment protection." *United States v. Silvestri*, 787 F.2d 736, 744 (1st Cir.1986).  Agents recognized the potential error and attempted to remedy any missteps of the JCPD by seeking warrants to search

the electronic devices found in the Defendant's truck.    For these reasons, the inevitable discovery doctrine applies and the evidence should not be suppressed.

### III.    Conclusion

For all the foregoing reasons, defendant's motion to suppress evidence should be denied.


Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY


By:    /s/ Leah Foley
       Leah Foley
       Assistant U.S. Attorney

Date:  November 12, 2014


### CERTIFICATE OF SERVICE

I hereby certify that a copy of this document will be served on counsel for defendant via the Court's ECF system.


/s/ Leah Foley
LEAH FOLEY
Assistant United States Attorney

Date:  November 12, 2014